The court took time to consider of their opinion.
f37th November, 1805, the court, concurred in granting a new trial.
(Grimke, Wattes, Brevard, and Wiifis, Justices,)
The judges delivered their opinions seriatim.
Brevard, J.
The defendant’s claim to the discount in question in this case, is founded on the act of 1759, “ for allowing discounts,” the policy of which is to avoid a multiplicity of actions. By this law, the defendant, by giving due notice of the discount intended to be insisted on, and exhibiting copies of all such deeds, or other writings, on which his claim may be founded, places himself in the situation of plaintiff in an original action, and is bound to prove his demand by the same rules of law and evidence, which would be necessary, and is exposed to every objection which w.ould be pro. per, if the action were brought by him in common form : and upon proving Jus demand, he shall be intitled to every advantage which he would have, in case he had maintained a regular action. The subject matter of discount in this case arose out of, and is blended with, the contract which gave rise to the note on which this action is founded ; and was therefore proper matter to be admitted in evi* dpnce by way of discount. 4 Burr. 2221.
*522 The action, if I may so call it, or subject of the discount, was brought forward to avoid the payment of money claimed by the plaintiff upon a consideration which has failed, or upon a' promise made through mistake, and which money the plaintiff has no right to demand, and ought not, according to equity and good conscience,’ to recover ; and is equivalent to' an action for money had and received. Indeed, it is a more equitable and certain remedy, because it prevents the recovery and receipt of money which otherwise might be recovered and received, by a party having no right thereto-in conscience. The defendant insists, that the value of so much of the land sold to him by the plaintiff, as the'plaintiff never Had any right to sell, and is unable to make a good title to, should be deducted from the note which- was given for the whole of the land.The defendant contends that no such deduction ought- to be madejas he insists he had a good title to all the land so sold by him to the defendant: therefore the question is, whether the plaintiff had-a good title to the land so sold,.-or can make a good title to the' same ?
The title from Monahan to the plaintiff is founded on naleed possession, without any appearance or colour of title, and without' any original grant- from either the lords proprietors, the king, or any oilier constituted authority of this country, to support it. To-maintain such a title, it must appear that a- title to land may be acquired by mere naked possession, either upon the principles of the common law, or by virtue of some positive law of force in this State.
There is-no principle of the common law- which ever gave such-a right.. I-t has- been supposed that in the beginning of society,when all things were in common, a man might acquire a kind of transient property in land, by the actual possession or occupation' of it, or by exercising'dominion over it: but the right of possession could continue no longer than the act of possession. See %' Bl. Com.
In the progress of society, when the necessity- of securing to-every one an exclusive arid permanent right to the undisturbed enjoyment of the lands in his possession, and to the improvements he should make, became obvious, the right of property in the substance' of the land itself, was instituted by a law of civil society, or by common consent, instead of the mere temporary right of occupan-cy, which was established by the law of nature : and, therefore,. this right of property has always been subordinate to the regulations of society. Among the Romans,' a bona fide possession of lands for a certain number of years, gave a title by prescriptions but there was no prescription against the Roman people, or the pub» *523 lie. In France, there could be no prescription as to the king’s demesnes. See Domat, B. 3, Tit. 7, sec. 4.
The maxims and rules of the common law which relate to this right, have always prevailed in this country, generally speaking, in the same manner as they have prevailed in England, from the time that the principles of English jurisprudence were adopted herewe must therefore have recourse to the English law, for the purpose of determining what our own law is on the subject, so far as it depends on general principles. In England, soon after the Norman conquest, the feudal principle was adopted, that the king is universal lord and original proprietor of all the lands in the kingdom, and that no other person can have any right to land, unless it be derived, either immediately or mediately, from him. Therefore, with respect to lands which are vacant, or which never have been granted by the king, no man can have a right, oi title, by the laws of England. Indeed, there is no right founded on mere possession, (so far as concerns real property,) in England, but in one instance, and that has been reduced to almost nothing by statute. I allude to the case where a tenant pur autre vie dies, during the life of cestui que vie, in which case he that could first enter might hold the land, by right of occupancy, during the life of cestui que vie. Co. Litt. 4. 2 Bl. Com. 259. But no prior occupancy was ever supposed against the king, for it is a maxim of English law, that nullum, tempus occurit regi: and where lands are newly formed, by the rising of an island in the sea, or by alluvion, or dereliction of the sea, they vest at opee in the king. 2 Bl. Com. 261. So if a subject dies intestate, without heirs, his lands revert to the king instantly upon his death.
The first settlers of this country, may have founded their original claims to land in some sort on occupancy; but so soon as they acknowledged allegiance to the crown, and subjection to the laws of England, they iu effect acknowledged the king as lord paramount, and first proprietor of all their lands. All the lands in this country were supposed to belong entirely to the crown, when king Charles the 2d granted the same to some of his courtiers in 1663. In 1665, be renewed his charter to the first lords proprietors, but expressly reserved the sovereign dominion of the crown. See Hewett’s History of South Carolina and Georgia. The lords proprietors surrendered their charter to the crown in 1728, and the country remained subject to the laws of England until the Revolution, when the people renounced their allegiance and subjection to the king of Great Britain, and set up an independent government. 'When that event took place, all the essential rights and prerogatives *524 of royalty were seized upon, and assumed by the people in their sovereign and corporate capacity; and amongst other rights and prerogatives, that of holding and granting all the vacant or unappropriated land® within the State : a right founded on the first prin._ ciples of civil society, and incidental to all established governments, whether republican or royal.
By the principles of the social compact, every member of the State, or body politic, comprehending every individual of the community, had an equal right to the unappropriated lands within the State, or territory, of the society ; and no one has any right to possess, or appropriate to himself exclusively, what thus belongs to all in common, without the consent of the others.
The will, or consent of the whole community, could be obtained only in such a way, as by the constitutions of the society were established for that purpose. The expression of the public will in this country, after the Revolution, could only be through the medium of representation;, and a representative legislative assembly was the only sufficient and legitimate organ of the public will. It was not found convenient, or expedient, to establish any system, or mode, for the purpose of giving to all the people of the State an equal Opportunity to obtain exclusive grants, to certain portions of the public, or vacant lands, until after the Revolution, when an act was passed for .that purpose, by the legislature, in 1784, (see P. L. 334.) The term “ vacant lands,” is used in this act, to denote lands not granted by public authority. This evidently appears from a clause of the act, which gives a right of pre-emption for six ittonths, to persons who had located land previously to the year 1775, on warrants of survey legally obtained, where no grant had issued ; and also to persons settled on vacant lands, who had been prevented from surveying and obtaining grants for the same, by the troubles of the Revolution. It has been argued, that a grant may be presumed : but this is deserting the ground of title by mere oc. cupancy or possession. A grant may be presumed from great length of possession, and other circumstances. But there is no positive rule, which says that any length of possession shall be sufficient. (Cowp. 102. Co. Litt. 6.) In the present case, the plaintiff does not even affect to claim under a grant; or to believe the land was ever granted to any one, from whom he can derive a title.
Upon general principles it is clear, that the plaintiff never had any right whatever to the land in dispute. Did he ever acquire any right or title, by virtue of any express provision, or by the constructive force of any legislative act of this State? It appears that Monahan located and surveyed the land in 1795, but never oh. *525 fained a grant. He did not, therefore, comply with the terms of the act of 1784, which prescribes the mode and conditions upon which the public vacant lands were to be obtained, nor with any subsequent act, by which he is authorized to claim the land in dispute.
It has been contended, that he acquired a title by the operation of the act of limitations of 1712, by possession. Let us examine that act, to see whether any construction can be fairly given to it, to support this position. The first section has an aspect entirely retrospective. It was obviously intended to guard against mischiefs then impending, and expected soon to take place, in consequence of pre-existing causes. The remedy provided, was evidently designed to give efficiency and validity to certain defective and insufficient deeds and other conveyances, before that time used in the transfer of real property, and which, from ignorance or necessity» were either not expressed with legal formality, or had not been executed with the necessary ceremonies ; or else had been executed by persons legally incapable of transferring their rights.
To avoid the, evils that were likely to ensue upou the discovery of such deficient conveyances, and to quiet the inhabitants in the possession, of lands which had been granted by the government, and honestly obtained by those in possession thereof, the act was passed. The first section enacts, “ that all possessions of, or titles to any lands, tenements, &c. within the province, derived from any grant from the lords proprietors, or the king, or from any settlements, or deeds of gift for the same, or from any sales or other con. veyances of the same, made either by executors, or by husbands in right of their wives, or by indorsements of patents, &c. — or where the persons now in possession, do possess, hold, or claim the same, as of his or their proper right in fee simple, and have been, (or those under whom they claim,) quietly possessed, and without lawful interruption enjoyed the same, severally and successively for the space of seven years last past, such persons, so in possession, shall have good right and title to the same, against ail persons whatsoever ; except persons beyond sea, &c.”
This section, then, has no application to the present case, as the plaintiff does not claim under any description of title in the.contemplation of it, or that existed anterior to the passing of it.
The second section of the act is prospective, and was intended to establish a rule of prescription, or to limit the time for bringing actions to recover the possession of lands, in all cases which might arise in future. It annuls the right of action, in cases where the owner has been out of possession, and another has had an adverse possession for the time prescribed. The right of the proprietor whq. *526 has ceased to exercise his right, after a certain period, is divested, ® J 1 and the wrongful possessor acquires that legal right which is.thus abandoned, or lost, by the rightful proprietor, by length of time and adverse possession. The right thus gained is founded on the presumpiion> that he who has enjoyed the possession for such a length of time, must have had a good title ; and that he who has neglected to exercise his right, must have been lawfully divested. (See Domat, B. 3, Tit. 7, sec. 4.)
It is declared by the second section, “ that it any person, or persons, to whom any right or title to lands or tenements, &c. shall hereafter descend or come, do not prosecute the same within five, years after such right or title accrued, that then he, or they, and all claiming under him, or them, shall be forever barred to recover the same; except persons beyond the seas, &e.”
The meaning of th.e words “ prosecute the same,” is explained in the following section, which declares, that all persons claiming lands, to make their claim effectual, shall make claim by their action of law, and not otherwise.” The fifth section declares, “ that .all persons who shall not make claim within the time limited, shall be barred ; and all claiming under such persons who have lost their ¡claim, shall be barred.”
To construe the act literally, would require a' prosecution by suit at law, w'ithin five years after the right or title of the plaintiff first accrued ; but this cannot be the true construction of the act; it must mean five years after the plaintiff’s right of action accrues, or the right of action of him, or them, under whom he. claims : be? cause without a right of action against some adverse claimant in possession of the land in dispute, how can a suit be sustained ? and the law requires nothing vain or impossible. By the same means whereby the right of possession and property is lost, the right of possession and property is acquired. Both parties must be supposed to found their claim upon a grant, but under titles differently derived. The party in possession must be presumed to have acquiree} h¡s possession by lawful means ; and if he be defendant, it will be sufficient to rely on possession alone, until a better title shall be established against him by some adversary claimant. If the plaintiff can show a good title in himself, it wtll overthrow the title of the defendant resting on mere possession, and a presumed right of property; and it will then be incumbent on him to produce a better title than that shewn by the plaintiff: and in order to do so, it will be necessary to produce some sort of legal conveyance, or derivative title under a grant, or patent, from the State, the Lting, or lords proprietors, otherwise the possession of the defend? *527 ánt must be regarded as tortious, and he himself considered as ail intruder and trespasser.
If the defendant can show a good colourable title, it will bo suf. ficient to suppon his right of possession, if he can prove that he has been in the quiet and continual possession of the land claimed by such title for the space of five years j unless the plaintiff can bring himself within the saving clause of the act.
The presumption of a better title in the defendant, is inferred1 from the long acquiescence and silence of the plaintiff. The peaceable possession of the defendant, is presumptive evidence of the' consent of the plaintiff, and that he is satisfied with respect to the' superior right of the defendant'. The policy of the act rests on1 this foundation of presumptive right, which it was intended to confirm; the object of the act being to quiet the actual occupants of land, claiming under colorable titles,-in the undisturbed enjoyment of their possessions, according to their respective titles and by this means, to encourage the settlement and improvement of the country.-
The civil law distinguishes between honest and fair possessors/ and those who possess knavishly. These last are regarded as usurpers, and wrong doers. Vide Domat, B. 3 Tit. 7. §. 1. It also distinguishes between those who possess with title, and those who’ possess without title. Vide Domat, B. 3. Tit. 7. §. 4.
By the common law, there was no time fixed for bringing actions,Co. Litt. 115. The English statutes of limitation contain nothing-' to warrant the notion that mere naked possession, without1 any evidence of title,- can bar the title of a proprietor of land, or give the right of property to the possessor, even between private individuals,where the land has beén granted, and the public property therein disposed of by the1 sovereign power of the country. Our act of limitations cannot-, l think, be construed to work any such effect in favor of a mere possessor, without any color of right, or in favor' of a secret,-fraudulent possessor, with color of title.
Upon' general principles of reason, justice, and policy, naked' possession, without title, is infilled to no consideration or indulgence. The limitation- act contains no words which can be fairly coni' strued to countervail these general principles. Subsequent acts of-the legislature clearly show, that no such title as' is contended for its.1 this case, can be accquired by mere occupancy. An act 1731;, P. L. 131, directs in what manner grants lost by fire, or other accident; may be supplied; and declares; that the record of such grant/ together with the actual possession of the party claiming under' the same, shall be good evidence of title, until-a better appears; Ahd-pro *528 vides, that if the party so claiming, can prove an actual and peaceable possession, for the space of'seven years and upwards, it shall enable bint to procure a new grant. Certainly it would have been idle and superfluous to have made this provision, if possession of five years, without any thing more were sufficient to give a good title, not only against individual claimants’, but against the king, or lords proprietors. The act of 1784, which points out the mode by which the right of the public to the vacant lands shall be disposed of, was un. doubtedly intended to comprehend all lands within the State, not before granted by the king or lords proprietors. An act of. 1787, {P. L. 430,) declares, that the State shall not be precluded by possession, or other cause, or title, from making inquest and sale of lands escheated ; and provides, “ that no lands claimed under grant, or under an actual possession for five years prior to the 4th July, 1776, shall be affected by the act.’’ The operation of this act must be confined to escheated lands. Another act of 1787, (P. L. 428,) declares, “ that an actual peaceablb and quiet possession of lauds, for five years previous to the 4th of July, 1776, shall be deemed a good and sufficient title, and that any grant obtained since that time, of the said land, shall be void.” This is the furthest the legislature has gone in favor of possession ; and these provisions hre evidently founded on the presumption that a grant once existed ; a reasonable presumption in favour of persons in possession before the declaration of independence, the evidences of whose titles might well be supposed to have been lost in the tumults of the Revolution.
It cannot be doubted, Í think, that-the possession of the plaintiff, not pretending to claim under a grant, could never raise a bar to the Claim of the public, so as to impair the validity of a subsequent grant from the State, or g>ve a right of property to the possessor. Therefore the grant to the defendant in 1795, must be held good.
There is another question which may be considered in this case, namely, what shall be the measure or extent of possession under the act of limitations ?
Where a man holds under a grant which is produced, or which may be legally presumed, and the limits of the land specified in the grant can be sufficiently ascertained, and he has had possession according to- the limitation act, of any part thereof, under a bona fide legal title, or conveyance, though colourable only, such possession, I am of opinion, ought to be considered a legal possession of the whole of the land comprehended in the grant; not only because the general rule is, that possession of part of an entire thing is always deemed the possession of the whole, but because the descripn’ *529 iion of the boundaries of the land claimed under a grant is matter of record, and contained in a public office, equally accessible to all persons concerned.
If the boundaries of lands granted to different grantees, should interfere, and one of them should have possession of that part of the land granted to him, which is not claimed by another; and ano. ther grantee should have possession of that part of his tract which the first grantee does not claim — then, Í think, the elder grant ought to be fully established, and the adverse claim, not being sup. ported by actual possession within the limits of the elder grant* disregarded. If both grantees should have actual possession, within the limits of the elder grant, and the junior grantee’s possession should be within the bounds of his own grant, then I should think actual possession under the junior grant, ought to prevail over constructive possession-under the senior grant.
As to the extent of possession, where the possessor claims with, out title, not under any grant produced, or presumed, (if such possession can cottier any right at all,) it ought not to cover any more land tiirm was actually occupied and in continual use, during the period of five years while the limitation act was running in favor of the occupant.